IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**HYDRADYNE HYDRAULICS LLC**, §
§
Plaintiff, §
§ Civil Action No. **3:09-CV-1577-L**
v. §
§
**POWER ENGINEERING AND** §
**MANUFACTURING LTD**, §
§
Defendant. §
§

## MEMORANDUM OPINION AND ORDER

Before the court are: (1) Power Engineering & Manufacturing, Ltd's Motion for Partial Summary Judgment, filed November 15, 2010; (2) Power Engineering & Manufacturing, Ltd's Motion to Strike Portions of Summary Judgment Evidence Submitted by Hydradyne Hydraulics, LLC, filed January 18, 2011; and (3) Power Engineering & Manufacturing, Ltd's Opposed Motion for Leave to Supplement Appendix in Support of Its Motion for Partial Summary Judgment, filed January 18, 2011.

After careful review of the motions, briefs, appendices, responses, replies, record, and applicable law, the court (1) **grants** Power Engineering & Manufacturing, Ltd's Motion for Partial Summary Judgment; (2) **denies** Power Engineering & Manufacturing, Ltd's Motion to Strike Portions of Summary Judgment Evidence Submitted by Hydradyne Hydraulics, LLC; and (3) **denies as moot** Power Engineering & Manufacturing, Ltd's Opposed Motion for Leave to Supplement Appendix in Support of Its Motion for Partial Summary Judgment.

# I.     Factual and Procedural Background

Hydradyne Hydraulics LLC ("Plaintiff" or "Hydradyne") filed its Original Complaint against Power Engineering and Manufacturing Ltd ("Defendant" or "PEM") in this court on August 26, 2009, showing that complete diversity of citizenship existed between the parties and that the amount in controversy exceeded $75,000, exclusive of interest and costs. Plaintiff subsequently amended its complaint twice, culminating in Plaintiff filing its Third Amended Original Complaint on August 9, 2010. Plaintiff asserts claims of breach of warranty, breach of contract, negligence, and fraud. Additionally, Plaintiff seeks punitive damages on its fraud claim and attorney's fees on its breach of warranty and contract claims. Defendant filed its Amended Answer on August 23, 2010, and brings a counterclaim against Plaintiff for breach of contract.

This case arises out of a business dispute between the parties. In fall 2003, Plaintiff requested PEM to design and manufacture complex, high-speed gearboxes for use in test stands for developing helicopter transmissions. PEM agreed to supply the gearboxes, and Plaintiff ultimately ordered four of them at a price of $162,000 per gearbox. The sales contract contained a limited warranty that expressly limited coverage "to defects in materials supplied or manufactured by [Defendant] and/or work, furnished by [Defendant] which occur, are discovered and reported." Def.'s App. 310.

PEM shipped the first two gearboxes to Plaintiff on May 24, 2005, and shipped the second two on June 24, 2005. During this time, Plaintiff started assembling the test stands and installed the gearboxes upon their receipt. Plaintiff subsequently delivered the partially assembled test stands to its customers in Canada, ACROHELIPRO Global Services, Inc. ("ACRO") and Canadian Helicopter Corporation ("CHC"). When the shipments arrived, the commissioning process of the

test stands began. This process involved full assembly, programming, and testing of the test stands. Plaintiff originally intended to complete the commissioning process over the course of several months at each location. For example, Plaintiff intended to complete the process at ACRO in December 2005. The process took significantly longer to complete, however, due to a series of problems both related and unrelated to the gearboxes. By December 2006, the process was still ongoing at ACRO and CHC.

The principal basis for Plaintiff's claims in this lawsuit, however, relates to the bearings used in the gearboxes. The gearboxes required bearings to function properly, and PEM originally used tapered roller bearings ("TRBs"), as opposed to angular contact ball bearings ("ACBs"). The TRBs failed at the ACRO site on December 6, 2006. Similarly, the TRBs failed at the CHC site in January 2007. Plaintiff replaced the TRBs after these failures, but the TRBs failed two more times at the ACRO and CHC sites during 2007, which further delayed the commissioning process.

Following the TRB failures, Plaintiff and PEM began investigating Hydradyne's lubrication system to ensure that each TRB was receiving an adequate flow of lubricant at the recommendation of the Timken Corporation ("Timken"), the entity that designed and selected the TRBs. Investigation would later reveal that Plaintiff's lubrication system was providing double the recommended lubrication flow to the TRBs. PEM's president Saul Herscovici ("Herscovici"), however, was convinced that the TRBs were performing adequately and that their failures were unrelated to the bearings themselves. By March 2007, Hydradyne expressed concern that TRBs would never work properly in the gearboxes.

Herscovici passed away on April 13, 2007, before the parties arrived at a lubrication solution to the TRB failures. By May 2007, Plaintiff determined that it wanted to replace the TRBs with a

different type of bearing and, by June 4, 2007, it developed a proposal to replace the TRBs. Rather than continue analyzing the TRBs and Plaintiff's lubrication systems, PEM elected to accept Plaintiff's request to replace the TRBs and returned a modified proposal to Hydradyne, which was accepted. Ultimately, PEM replaced the TRBs with ACBs at no cost to Plaintiff in December 2007 at the ACRO site and in summer 2008 at the CHC site. After the new bearings were implemented, Hydradyne reported no further problems with the gearboxes, and it continues to have no complaints regarding the gearboxes today. Plaintiff completed the commissioning process of the test stands with respect to the gearboxes at the CHC and ACRO sites in a timely and expeditious manner following the new bearing implementation.[1] A year later, on August 26, 2009, Plaintiff filed this lawsuit and brought causes of action against PEM for breach of warranty, breach of contract, negligence, and fraud. Each claim arises out of the troubles caused by the bearing selection and bearing performance in the gearboxes. Defendant now moves for summary judgment in its favor on those claims because it argues that the negligence and breach claims are time-barred, and that there is no evidence to support Plaintiff's fraud claim.

## II. Legal Standard – Motion for Summary Judgment

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the

---

[1]Commissioning the test stand at the ACRO site was finished in August 2008 due to other work that Hydradyne had to do, unrelated to the gearboxes at the subject of this litigation.

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary"

will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

### A.    Defendant's Motion for Partial Summary Judgment

Although PEM requests that the court grant summary judgment in its favor on all of Hydradyne's claims, its motion is styled as one for partial summary judgment because PEM has a pending cross claim against Plaintiff for breach of contract. Defendant's motion for summary judgment does not address its cross claim against Hydradyne. Although PEM's motion does not seek disposition on every claim asserted by the parties in this case, the court believes that addressing the merits of Plaintiff's claims will substantially narrow the issues pending for trial and assist the parties in their resolution of this matter. With respect to Plaintiff's claims, Hydradyne asserts four causes of action against PEM: negligence, breach of contract, breach of warranty, and fraud. The court will address each claim separately.

#### 1.    Negligence

Defendant argues that Hydradyne's negligence claim is time-barred under the statute of limitations, which is two years in Texas for tort claims. Tex. Civ. Prac. & Rem. Code Ann. § 16.003 (Vernon 2002). Plaintiff concedes that this claim is time-barred because it has been more than two years since its negligence cause of action accrued and this lawsuit filed. The court therefore determines that there is no genuine issue of material fact as to Plaintiff's negligence claim and that PEM is entitled to judgment as a matter of law on the claim.

## 2. Breach of Contract & Breach of Warranty

Defendant likewise contends that Plaintiff's breach of contract and breach of warranty claims are time-barred under the statute of limitations, which is four years in Texas for contract claims. Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (Vernon 2002). Hydradyne argues that its breach of contract claim is essentially a repackaged pleading of its breach of warranty claim and that such claim is not time-barred because PEM's limited warranty extended explicitly to future performance, which forms an exception to the limitations period.[2] Specifically, Plaintiff argues that the language of PEM's limited warranty conveys that PEM warranted the gearboxes to be free from defects for six months from the date of shipment.

Texas law provides that the limitations period for a breach of warranty claim begins "when tender of the delivery is made, except . . . where a warranty explicitly extends to future performance of the goods . . . ." Tex. Bus. & Com. Code Ann. § 2.725 (Vernon 2009). When a warranty explicitly extends to future performance, the limitations period does not begin to run upon initial delivery of the goods; it instead starts to run "when a reasonable buyer should have discovered any defects, up until the end of the [specifically warranted time period]." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd.*, 146 S.W.3d 79, 93 (Tex. 2004). Applying this rule to this case, if PEM warranted that its gearboxes would be free from defects for a period of six months, as Hydradyne argues that PEM did, then the limitations period on a breach of warranty claim would have lasted until November 2009 instead of June 2009. As Plaintiff filed its breach of warranty claim in August 2009, a limitations period lasting until November 2009 would mean that

---

[2]Plaintiff otherwise concedes that, but for this exception, its breach of contract and breach of warranty claims would be time-barred under the statute of limitations because such claims accrued at the latest of June 2005 and its lawsuit was not filed until August 2009.

Hydradyne's claim was timely filed. For reasons discussed below, however, the court determines that Hydradyne's breach of warranty claim was not.

PEM directs the court to a Texas Court of Appeals case that involved a limited warranty similar to the one at issue here. In *Muss v. Mercedes-Benz of North America, Inc.*, the plaintiff purchased an automobile from the defendant and filed a breach of warranty claim some years later due to the car's defective suspension system. 734 S.W.2d 155, 157 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). The plaintiff's claim was brought outside of the four-year limitations period for such claims, but he attempted to extend the limitations period on the claim by invoking the future performance exception under § 2.725 of the Texas Business & Commerce Code. *Id.* The warranty in that case provided as follows:

> Any authorized Mercedes-Benz dealer of the owner's choice will, without charge to the owner, perform warranty repairs made necessary because of defects in material or workmanship . . . . This warranty shall remain in effect until the vehicle has accumulated 24 months or 24,000 miles of use, whichever first occurs . . . .

*Id.* at 157-58. The *Muss* court ultimately held that the future performance exception under § 2.725 did not apply because the warranty conveyed no promise that the goods were free from defects in materials or workmanship and that "the promise on its face directly pertains to compliance by the seller with an obligation to make repairs in the future rather than to future compliance by the goods with some performance standard." *Id.* at 158. In this case, the court notes the striking similarity of the warranty in *Muss* to PEM's warranty here, which provides:

> [PEM] warrants each new transmission or gear box, new parts and/or components, and each rebuilt gear box manufactured by [PEM] to be free from defects in materials supplied or manufactured by [PEM] and workmanship furnished by [PEM] under normal use and service conditions . . . [PEM]'s warranty is limited to defects in materials supplied or manufactured by [PEM] and/or work, furnished by [PEM]

> which occur, are discovered and are reported to [PEM] within . . .
> [t]he first 1,000 hours of operation or the first six (6) months from
> date of shipment, whichever occurs first . . . .

Def.'s App. 310. Both warranties provide a remedy for discovered defective components, and both warranties restrict the length of time in which such warranty remains in effect.

Plaintiff contends that the warranty in *Muss* is distinguishable from PEM's warranty in this case because the warranty in *Muss* did not contain a promise that the goods would be "free from defects." *See Muss*, 734 S.W.2d at 158. Because the *Muss* court paid special attention to that portion of the warranty, Hydradyne argues that the presence of such a promise in PEM's warranty is dispositive insofar as invoking the future performance exception under § 2.725. The court disagrees.

Although the *Muss* court based part of its analysis on the absence of an express promise that the goods were "free from defects," it ultimately concluded that the promise did not guarantee that the goods would meet some performance standard for a definite time in the future. *See id.* Instead, the *Muss* court determined that the promise related to a definite time in the future during which the seller would be obligated to repair or replace any defective components. *See id.* In this case, the court reaches the same result in its plain reading and understanding of PEM's warranty. "Express warranties that meet the 'explicitness' exception of section 2.725(b) may extend to future performance. Courts construe the exception narrowly, with the emphasis on the term 'explicitly.'" *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 548 (Tex. 1986) (citations omitted).

With respect to PEM's warranty, the court is unpersuaded that PEM has "explicitly" stated a definite time in the future during which the quality of the goods was assured. "For an express warranty to meet the exception, it must make specific reference to a specific date in the future." *Id.*

(citation omitted). The only statement in PEM's warranty that relates to an "explicit" future date concerns the time period and manner in which PEM agreed to make repairs or replacements of defective components. The court therefore draws no distinction between the type of warranty presented in *Muss* and the type of warranty presented in this case by PEM. Moreover, "that the manner in which the goods actually perform can be tested only at a time subsequent to delivery, does not per se convert the warranty into one extending to future performance. To so argue would make the exception swallow the rule because virtually all warranties must be so tested." *Muss*, 734 S.W.2d at 158 (citation omitted).

The court determines that PEM's warranty did not make an "explicit" specific future promise with respect to gearbox performance and that the limitations period was not extended under § 2.725. Hydradyne's breach of warranty and breach of contract claims are therefore time-barred because it has been more than four years since these causes of action accrued and Plaintiff filed this lawsuit. There is accordingly no genuine issue of material fact as to Plaintiff's breach of warranty and breach of contract claims, and PEM is entitled to judgment as a matter of law on these claims.

### 3. Fraud

Defendant makes two arguments in support of summary judgment on Plaintiff's fraud claim. First, PEM contends that all of Hydradyne's claims, including its fraud claim, are barred by the express terms and conditions of the limited warranty. Second, PEM contends that there is nothing in the record to support Hydradyne's fraud claim and that Hydradyne's version of the facts is unsupported by the summary judgment evidence.

With respect to PEM's contention that the limited warranty bars Plaintiff's fraud claim, the court expressly rejects this contention. While legal legerdemain may be a common practice in the

negotiation of a contract, it does not grant one party a license to commit fraud. The court cannot allow a party to insulate itself from liability for fraudulent conduct by inserting a cleverly worded contractual provision. *Ehringer Enters. Inc. v. McData Servs. Corp.*, No. 3:06-CV-812-L, 2010 WL 711818, at *4 (N.D. Tex. Feb. 25, 2010) (Lindsay, J.); *see Calloway v. Manion*, 572 F.2d 1033, 1038-39 (5th Cir. 1978). The court accordingly determines that the express terms and conditions of PEM's limited warranty do not bar Hydradyne's fraud claim.

The court now addresses PEM's contention that there is no evidence to support the fraud claim. Plaintiff advances its fraud claim under the legal theory of fraud by nondisclosure. Under Texas law, failure to disclose information constitutes fraud by nondisclosure when (1) a defendant had a duty to disclose material facts to the plaintiff; (2) the defendant conceals or fails to disclose a material fact within his knowledge; (3) the defendant knows that the plaintiff is ignorant of the fact and does not have an equal opportunity to discover the truth; (4) the defendant intends to induce the plaintiff to take some action by concealing or failing to disclose the fact; and (5) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed fact. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008); *Bradford v. Vento*, 48 S.W.3d 748, 754-55 (Tex. 2001).

Hydradyne contends that PEM fraudulently failed to disclose that Timken informed PEM in 2004 that ACBs were a viable alternative to TRBs for use in the gearboxes. As a result, Plaintiff argues that it incurred needless, significant expense in searching for a remedy to the TRB failures that would have been unnecessary had Herscovici disclosed this from the outset. Hydradyne argues that a fact question exists with respect to Herscovici's fraudulent intent and that summary judgment should accordingly be denied on the fraud claim.

The court first decides whether PEM, through its president Herscovici, owed Hydradyne a duty to disclose. There must be a duty to disclose to bring an actionable claim for fraud by nondisclosure. *Dorsey*, 540 F.3d at 341 (citation omitted). Whether such a duty exists is a question of law for the court to decide. *Bradford*, 48 S.W.3d at 755. Under Texas law, a duty to disclose may arise in the following instances: "'(1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression.'" *EnviroGLAS Prods., Inc. v. EnviroGLAS Prods., LLC*, 705 F. Supp. 2d 560, 572 (N.D. Tex. 2010) (Fish, J.) (quoting *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.—Houston [14th Dist.] 1997, writ denied).

Hydradyne contends that Herscovici had a duty to disclose because he previously disclosed certain limited information to Plaintiff about the TRBs but had not disclosed the whole truth, which created a false impression. Specifically, Plaintiff states that Herscovici told Hydradyne that the TRBs would meet the speed requirements for the gearboxes and did not mention that any concerns had been raised with respect to the performance of the TRBs. Following the first TRB failure on December 6, 2006, Herscovici reportedly informed Plaintiff that the TRBs were the only appropriate bearings for the gearboxes and that their design had nothing to do with their failures. Herscovici urged that Hydradyne's lubrication system was the source of the TRB failures and, when he was asked by Plaintiff about the possibility of an ACB solution, Herscovici said only that he would look into it and did not indicate that Timken had previously discussed the possibility of ACBs when the gearboxes were being designed.

PEM contends that, even if everything Hydradyne argues is true with respect to what Herscovici told Hydradyne about TRBs and what he did not disclose about ACBs, there was nothing further for Herscovici to disclose. To this end, Defendant asserts that the information disclosed did not in any way require discussion of ACBs to reveal "the whole truth" about the bearings. From PEM's perspective, the decision to use TRBs was made early in the design phase and was believed by Herscovici and Timken to be the best approach. Having ruled out the ACB option, it would not have made sense to discuss the possibility of using ACBs when PEM was focused on making the *TRBs* perform properly. The evidence establishes that Herscovici had significant prior experience using TRBs and had confidence in their viability. PEM contends that there is simply no evidence in the record to support Hydradyne's fraud claim. After conducting a meticulous review of the evidence before it, the court agrees with PEM.

Hydradyne makes several contentions in support of its fraud claim, derived from its interpretation of evidence in the record. For example, Plaintiff relies on an internal Timken e-mail dated February 25, 2004, where a speed matrix was discussed concerning the use of TRBs and enhancements to improve TRB performance. *See* Pl.'s App. 256. The e-mail's author indicated that the speed matrix should be given to Herscovici so that PEM can see "how they are pushing the envelope quite hard." *Id.* Hydradyne takes this e-mail to mean that Timken provided Herscovici with the speed matrix and that TRBs were ultimately chosen to keep Herscovici "happy." There is no evidence in the record, however, that PEM or Herscovici ever received the speed matrix or that Timken selected TRBs solely to placate to Herscovici. To the contrary, a letter from Timken to PEM dated June 22, 2005, states that "a tapered bearing was determined to be the best bearing

support for the system" and that "several bearings were reviewed and modeled in Timken's bearing analysis." Def.'s App. 224.

Hydradyne also relies on a Timken internal e-mail dated October 14, 2004, in which the author noted that the "angular contact ball bearing offering represents the best performing and most economical differential solution" for the gearbox. Pl.'s App. 247. Plaintiff takes this internal e-mail to mean that Timken had recommended to PEM that ACBs performed better than TRBs in high speed applications and were the best performing option for the gearboxes. Like the February 25, 2004 internal e-mail, however, there is no evidence in the record that the author's note about ACBs was ever conveyed to PEM or Herscovici, or that Timken ever recommended using ACBs over TRBs. Deposition testimony from Timken employee Thomas Baker reveals that, although ACBs were initially considered in the gearbox design, Timken had concerns about their ability to handle the high loads and high speed of the application and decided not to use them. *Id.* at 233-34 [227:24-228:22]. Timken ultimately elected to go with a TRB solution. *Id.*

Another example is Hydradyne's reliance on a December 9, 2004 letter from Timken to Herscovici, in which Timken apprised Herscovici of the difficulty involved in developing "standard bearings" to accommodate the high loads and high speeds of the application. *Id.* at 260-61. The letter also specifically stated that there would be no warranty of fitness for a particular purpose with respect to the bearing design that Timken would ultimately select. *Id.* Plaintiff takes this letter to mean that Herscovici was aware that even modified TRBs might fail in the gearbox application. The court views this evidence as demonstrating only that the project from Timken's perspective would constitute a heavy undertaking. The letter mentions nothing about ACBs being a viable or better alternative to modified TRBs. Deposition testimony from Timken employee Troy List further

establishes that there was nothing in the letter to indicate a warning by Timken against the use of TRBs. Def.'s App. 95 [177:15-178:11].

Hydradyne also points to a May 19, 2005 letter sent from PEM to Hydradyne as evidence of fraud. In this letter, PEM employee Brad Banwarth wrote Plaintiff on behalf of Herscovici to state that the main reason for PEM's delay in delivering the TRBs was solely due to the complexity of their cages. Pl.'s App. 294. Hydradyne argues that this e-mail created the false impression that the special cages were the most critical part of the discussions concerning bearing selection and failed to divulge Timken's analysis of ACBs as a viable option, or of Timken's warnings to PEM concerning the severity of the gearbox application . The court is at a loss to see how the information provided in the letter relating to the special cages constitutes a false impression. There is nothing in the record indicating that the special cages did not require extensive development, given the complexity of the modified TRBs. With Timken and PEM having already determined that TRBs offered the best solution, *see id.* at 233-34, discussion of ACBs would have been irrelevant and indeed, immaterial. The apparent purpose of the letter was to inform Hydradyne about the type of bearings being used and the reason for delay in delivery, a delay which arose from the design of special cages. The letter accomplished this purpose without omitting certain key facts to conceal "the whole truth."

Hydradyne further relies on an affidavit submitted by one of its former employees, John Maschek, and an e-mail that John Maschek submitted to Herscovici on February 9, 2007, memorializing a phone conversation they had with each other earlier that day. The affidavit and e-mail reveal that John Maschek asked Herscovici about the possibility of ACBs as a viable alternative to the TRBs. *Id.* at 315-16; 324. Herscovici stated that he would look into the matter. *Id.* Plaintiff

contends that this is evidence of fraud because Herscovici already knew that ACBs were a viable alternative from his discussions with Timken in 2004, including Timken's prior "recommendation" that PEM pursue an ACB solution. The court strongly disagrees because, as discussed above, there is no evidence that Timken ever actually made that recommendation to PEM. The uncontroverted evidence demonstrates only that Timken initially considered ACBs as an option but ultimately decided that TRBs provided the best solution capable of handling the high loads and high speeds of the gearbox application. *See id.* at 233-34.

Hydradyne finally argues that, based on all the evidence, Herscovici had a clear motive to cause Plaintiff to rely on his nondisclosure of certain material facts related to the TRBs. Namely, Hydradyne contends that Herscovici did not want to disclose the ACB solution or Timken's warnings about the heavy undertaking involved in the gearbox design. Plaintiff further states that, had it know everything in advance, it would have ordered that ACBs be used instead of TRBs. The court reiterates that the evidentiary record makes no indication that Herscovici was ever aware of an "ACB solution." It establishes that Herscovici was experienced with TRBs and had successfully used them in previous applications. The gearbox design was admittedly a heavy undertaking, due to the high loads and high speeds involved, and the record reflects that Hydradyne, PEM, and Timken were aware of that. Further, the court questions Plaintiff's contention that it would have ordered the use of ACBs instead of TRBs had it been fully apprised in advance. By Hydradyne's own admission, its employees John Maschek and Dean Mickelson were not bearing experts and had no knowledge concerning the relative merits of TRBs against ACBs. *See id.* at 279 ¶ 16; 313 ¶ 7. Hydradyne's contention that it absolutely would have demanded that an ACB solution be pursued had everything been initially disclosed constitutes conjecture and speculation after the fact, given

Plaintiff's lack of previous experience in bearing design. Timken and PEM arrived at a TRB solution; nothing in the record indicates that Plaintiff would not have deferred to the judgment of Timken and PEM had it been made privy to their original design discussions.

With respect to Herscovici's motive to create a false impression, Plaintiff contends that such fraudulent intent can be reasonably inferred from (1) Herscovici's prior use of TRBs and his inexperience with ACBs; (2) Timken's modified TRB solution being less expensive than a proposed ACB solution; (3) the assurance Herscovici received that he could supply a TRB with enough lubrication; (4) Herscovici's recommended lubrication flow doubling Timken's recommendation; and (5) Herscovici's immediate and consistent blaming of Hydradyne's lubrication system for the TRB failures. Pl.'s Resp. 34-35. Although these five matters are set forth in the record, the court stops well short of concluding that they reasonably support or even intimate Herscovici's fraudulent intent. As to the first factor, Herscovici's prior experience with TRBs and inexperience with ACBs, this only strengthens PEM's position that Herscovici believed that TRBs, not ACBs, offered the best solution for the gearbox design. As to the second, third, fourth, and fifth factors, Hydradyne's theory seems to be that Herscovici wanted to save costs by using a TRB solution, and he intended to deflect the inevitable TRB failings onto Hydradyne's lubrication system. This theory smacks of conjecture and speculation, and accepting it requires a quantum leap in logic.

If the court accepts that Herscovici's motive was to cut costs by using an inferior bearing solution that he knew would fail, while simultaneously being aware of a viable, although more expensive, ACB solution, he would also have been aware of the future costs, hassle, and loss of goodwill to follow soon after, when he would ultimately blame Plaintiff's lubrication system for the TRB failures. The record establishes that PEM replaced all of the TRBs with ACBs at its own cost,

in excess of $25,000, at the ACRO site in December 2007 and at the CHC site in 2008, and incurred thousands of dollars in expenses for labor and materials for other work performed on the gearboxes outside of the warranty period. Def.'s App. 307-308 ¶ 18. If Herscovici's motivation was to save costs, as Hydradyne contends, the record does not support Hydradyne's theory in light of the significant amount of expenses incurred by PEM in its response to the TRB failures that Hydradyne contends Herscovici knew were inevitable.

Based on the foregoing analysis, the court determines that there was no "whole truth" for Herscovici to disclose to Hydradyne and that Hydradyne's alleged "selective disclosures" did nothing to make any earlier representations misleading or untrue. Moreover, the evidence does not demonstrate that Herscovici did anything to give Hydradyne a false impression. The evidence supports that Herscovici (and Timken) acted in a manner that they believed would produce the best result insofar as accommodating the high demands of the gearbox application. The court therefore determines that there was no duty owed by Herscovici to disclose anything to Hydradyne concerning Timken's initial consideration of an ACB solution in 2004, a solution that was ultimately rejected by both Timken and PEM. Even if such duty did exist, for the reasons discussed above, there is no evidence in the record that Herscovici concealed or failed to disclose anything material within his knowledge or that he intended to induce Hydradyne to take any action by such concealment. Plaintiff's fraud claim is rooted in speculation and mere conjecture, and, at best, only raises a "scintilla of evidence." Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth*, 19 F.3d at 1533. Plaintiff's burden must be carried by more than a "scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). In reviewing the record and analyzing the evidence, the court

concludes that Plaintiff ascribes more significance to the evidence than is legally acceptable or warranted in its attempt to establish a fraud claim.

Having determined that no duty to disclose existed and that the uncontroverted evidentiary record cannot reasonably support at least two of the required elements of a fraud by nondisclosure claim, the court determines that no genuine issue of material fact exists and that judgment as a matter of law is proper. PEM is accordingly entitled to judgment in its favor on Hydradyne's fraud claim.

### B.     Defendant's Other Motions

PEM filed two additional motions in this case relating to summary judgment evidence. Defendant requests that the court strike portions of Hydradyne's appendix, including the affidavits of Dean Mickelson, John Maschek, and Joseph Poplawski. Defendant also requests leave to supplement its appendix with additional pages from the depositions of Troy List and Dean Mickelson.

With respect to PEM's request to strike certain portions of Hydradyne's appendix, the court **denies** Power Engineering & Manufacturing, Ltd's Motion to Strike Portions of Summary Judgment Evidence Submitted by Hydradyne Hydraulics, LLC, because it did not determine that the objected-to paragraphs in the affidavits of Dean Mickelson and John Maschek constituted hearsay or were insufficiently vague and ambiguous. With respect to the affidavit of Joseph Poplawski, PEM stated that it would file a separate motion to exclude the opinions of Joseph Poplawski to "further outline its objections." Def.'s Mot. to Strike  at 8. PEM never filed a subsequent motion to exclude, but, in light of its analysis above, the court believes that such motion is now moot.

With respect to PEM's request for leave to supplement its appendix, the court **denies as moot** Power Engineering & Manufacturing, Ltd's Opposed Motion for Leave to Supplement Appendix in Support of Its Motion for Partial Summary Judgment, because it did not have a need for the additional pages of deposition testimony to conduct its above analysis.

## IV.    Conclusion

For the reasons stated herein, the court determines that there is no genuine issue of material fact and that PEM is entitled to judgment as a matter of law on Plaintiff's four claims. The court accordingly **grants** Power Engineering & Manufacturing, Ltd's Motion for Partial Summary Judgment and **dismisses with prejudice** Plaintiff's claims for negligence, breach of contract, breach of warranty, and fraud.

The court realizes that there remains a pending counterclaim for breach of contract. PEM seeks reimbursement from Hydradyne for the expenses and time spent in making repairs to the gearboxes outside of the warranty period. The court believes that this claim can be resolved by the parties and strongly urges them to do so in light of the court's above ruling on the motion for summary judgment. The court believes that PEM's counterclaim was filed only in response to Hydradyne's lawsuit, and it is not a claim that PEM, in all probability, would have brought had the lawsuit not been filed. As the court has disposed of Hydradyne's claims, it sees little reason for PEM to now continue pressing litigation with respect to its counterclaim. The court accordingly **orders** the parties to confer and inform it in writing no later than **May 4, 2011**, whether the counterclaim can be resolved without further litigation.

**It is so ordered** this 20th day of April, 2011.

Sam A. Lindsay
United States District Judge